IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AUTOMOTIVE PROFESSIONALS, INC. | ) | Case No. 07-6720 |
| | ) | |
| Debtor. | ) | Hon. Carol A. Doyle |

**CERTAIN CREDITORS FINAL RESPONSE BRIEF IN SUPPORT OF THEIR
POSITION THAT API IS NOT AN INSURANCE COMPANY**

Certain creditors of Automotive Professionals, Inc. (the "Debtor") namely Continental Insurance Services, Inc., Finance Builders, Inc., Independent Insurance Services, Inc., Jeff Frey & Associates, Performance Management Group, Inc., and Profit Portfolio (collectively, the "Creditors"), by their attorneys, Arnstein & Lehr LLP, submit this Final Response Brief in support of their position that the Debtor is not an insurance company, pursuant to this Court's Order dated May 10, 2007 [133] relating to the motion filed by the state of Illinois (the "State") to dismiss this bankruptcy [63] and in response to the State's Supplemental Memorandum in Support of their Motion to Dismiss [140]. In support, the Creditors state as follows.

To this point, the Court has received many, many pages of briefs on this issue. For the sake of brevity, the Creditors will not restate the arguments which have been made, in some cases on multiple occasions, on the issue confronting the Court. This brief will rebut the State's positions on two issues, and argue (1) that the Debtor did not lose its qualification under the Service Contract Act (the "Act") and so did not morph into an unlicensed "domestic insurance company"; and (2) that the Debtor is not the "substantial equivalent" of an insurer and is not subject to exclusion under § 109(b).

I.  **API did not "lose" its qualification as a provider under the Service Contract Act by virtue of the insurance it procured for non-Illinois contract purchasers.**

The Court should reject the State's argument that the Debtor did not comply with the Act because it failed to obtain "first dollar" insurance requirements in all states, even though the insurance for Illinois contract holders met the Illinois "first dollar" requirements. The fundamental disagreement between the State and all other parties concerns the interpretation of section 15 of the Act, which sets forth the Illinois requirements for service contracts "issued, sold, or offered for sale in this State."

The State's position, in sum, is that because the Debtor was based in Illinois, any vehicle service contract, even if it was sold in Arizona by an Arizona car dealer to an Arizona resident for an Arizona vehicle to cover repairs which would be made in Arizona, was "issued . . . in" Illinois. There appears to be no dispute that the Debtor obtained insurance for Illinois contract holders which is consistent with Illinois' "first dollar" requirements, and no dispute that contracts sold outside of Illinois were not "sold or offered for sale" in Illinois. The State's only gripe is with the insurance the Debtor procured for contracts outside of Illinois.

The State's position brazenly ignores not only the language of the statute and case law, but also constitutional restrictions on a state's ability to regulate a transaction outside its boundaries and jurisdiction. The consequences of a finding in favor of the State are breathtaking. This Court should refuse to make such a finding, for four reasons: (1) the State's interpretation of the Act is inconsistent with its terms and intent; (2) case law interpreting language similar to that in the Act undercuts the State's position; (3) the State's position is inconsistent with its previous dealings with the

2

Debtor; and (4) the State's position violates the Commerce Clause and Full Faith and Credit clause of the Constitution.

### A. The State's position is inconsistent with the intent of the Service Contract Act.

In interpreting the language of a statute, the Court should "give words their plain meaning unless doing so would frustrate the overall purpose of the statutory scheme, lead to absurd results, or contravene clearly expressed legislative intent." United States v. Davis, 471 F.3d 783, 787 (7th Cir. 2006). Courts must "construe statutes in the context of the entire statutory scheme and avoid rendering statutory provisions ambiguous, extraneous, or redundant" and "favor the more reasonable result." Cole v. U.S. Capital, 389 F.3d 719, 725 (7th Cir. 2004). The State, in its attempt to interpret the Service Contract Act, does not put the language at issue in the context of the entire statutory scheme and ignores those parts of the statute which do not suit its purposes.

The language of the Service Contract Act exists to protect Illinois consumers only, not consumers throughout the United States. The enforcement provision of the Act, 215 ILCS 152/50, says:

Sec. 50. Examinations and enforcement provisions.

(a) The Director may conduct examinations of service contract providers, administrators, or other persons to enforce this Act and protect service contract holders in this State. . . .

(b) The Director may take action that is necessary or appropriate to enforce the provisions of this Act and the Director's rules and order and to protect service contract holders in this State. If a service contract provider engages in a pattern or practice of conduct that violates this Act and that the Director reasonably believes threatens to render the service contract provider insolvent or cause irreparable loss or injury to the property or business of any person or company located in this State, the Director may . . .

3

(emphasis supplied). There is no place in the Act which empowers the Director to take any action to protect service contract holders in any other state – nor, as set forth below, could there be. Because courts should interpret statutes so as not to add words which are not there, the Court should find that the Act exists to protect Illinois consumers only.

### B. Case law does not support the State's interpretation of the Service Contract Act.

Binding authority regarding the interpretation of the word "issued" does not support the State's position. In Prestige Casualty Co. v. Mashburn, 612 F.2d 1048 (7th Cir. 1980), the Seventh Circuit directly addressed the use of the word "issued" in an insurance policy. In Prestige, an insurance agent submitted a request to an insurance broker to have an insurance company transfer insurance coverage from one car to another for a policyholder. The insurance company made the change and issued an endorsement to the broker, but not the policyholder. The policyholder was then involved in an accident in the original car. The insurance company disclaimed coverage, and filed a declaratory action. The trial court found in favor of the policyholder, and the Seventh Circuit affirmed.

The decision turned on the interpretation of the word "issued." The insurance policy contained the following language: "nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy." By that language, unless the endorsement was issued, the terms of the policy could not be changed. The court considered whether the insurance company's issuance of the endorsement to the broker but not the policyholder constituted an "endorsement issued." It found that the

4

insurance company's act of mailing the stamped endorsement to the broker but not the policyholder did not constitute "issuance" to the policyholder. Id. at 1049.

The Prestige case undercuts the State's argument that merely printing the contract on paper and sending it to dealers around the country constitutes "issuing" the contract. The Seventh Circuit clearly focused not only on the act of the issuing party, but also the act of receipt of the document. Under the Prestige case, the contract would be "issued" when the end recipient – the service contract holder – purchased it. That, of course, occurred in the state where the contract was sold, not Illinois.

Notwithstanding Prestige, no Illinois law supports the State's interpretation of the Act. The State's citation to Diamond State Ins. Co. v. Chester-Jensen Co., 243 Ill. App. 3d 471, 611 N.E.2d 1083 (Ill. App. 1st Dist. 1993) is misplaced. That case contains no analysis whatsoever of where the policy in question was "issued." The case only discussed where Transco was based to determine which state had the most significant contact for purposes of a choice of law analysis. Diamond State does not hold that a contract is "issued" at the corporate headquarters of the service contract provider, nor is persuasive authority on this Court.

**C.     The State should not be permitted to reclassify the Debtor at this late date.**

The Court should not permit the State to reclassify the Debtor as an insurance company at this late date. Until February of this year, the State treated the Debtor as a service contract provider, not an insurance company. That classification should remain in place, because the State's current position is completely inconsistent with its prior practice pertaining to the Debtor and because case law demonstrates that the initial classification controls.

5

Before the Debtor's insolvency, the State through the Director of Insurance took a number of steps which are relevant here. First, the Director approved the contract form, including its various provisions for specific states. The form reflects that different states have different statutory schemes regarding vehicle service contracts. These different schemes make it virtually impossible for a provider like the Debtor to "issue" its contracts in one state. Thus, the Director approved the form, with its different applications in the different states where it is issued. Second, the Director's office drafted a letter, attached as Exhibit D to the Declaration of James Hawk, which says that if the "financial choice" of the Debtor is the $25,000.00 security deposit in the statute, an audited statement "must show for Illinois only", while its funded reserve account must be held "for the benefit of Illinois service contract holders."

The State further applied its policy of regulating only contracts issued to Illinois residents when it approved the VSC contract form. Even though Illinois law requires that all service contracts backed by reimbursement policies must state that the contract holder may make claim against the reimbursement insurer if the provider defaults, the State approved a form which excludes New York contract holders from that protection. It had a sensible reason: API had chosen to apply an alternative form of protection, the escrow account, there. Illinois law requires that providers choosing that approach so state to the regulator, and file financial information about the escrow account in Springfield. But, as we have seen, Illinois practice is to require that providers using escrow accounts report to it only those accounts protecting Illinois contract holders.

Case law also dictates that the initial classification by the State should control.

6

In Gamble v. Daniel, 39 F.2d 447 (8th Cir.), cert. denied, 282 U.S. 848, 75 L. Ed. 752, 51 S. Ct. 27 (1930), a trust company was accused of accepting deposits as if it were a bank, just as Illinois accuses API of selling "insurance" as if it were an insurance company. The court rejected the argument that this behavior made it an accidental "bank," commenting that, "it would be strange if Congress would permit the classification under section 4 (and, therefore, the application of the entire Act) to be controlled by the exercise of *ultra vires* powers by a corporation. . . . We have no doubt that when Congress used the words 'banking corporations' it meant corporations which were authorized by the laws of their creation to do a banking business." Id. at 450.

In In re Oil and Gas Insurance Company, 1991 U.S. Dist. LEXIS 20736 (C.D. Cal.), the State of Illinois sought the dismissal of a bankruptcy case filed in California by an Illinois insurer. The insurer contended that it had ceased to be an insurance company because it stopped engaging in the "business of insurance" after Illinois filed for its rehabilitation. The California court rejected that position:

> As the Second Circuit noted in Union Guarantee, 'it is the powers conferred upon the company, not its activities, which are decisive.' Union Guarantee, 75 F.2d at 985 (rejecting argument that insurer ceased to be an insurance company when the state terminated its insurance business). The key focus for determining whether a corporation is an excluded insurer is the corporation's charter or articles of incorporation. Peoria, 75 F.2d at 778 (emphasizing that appellant was not authorized to do any business other than insurance). 'Even though, during the period of rehabilitation or liquidation, it ceases some or all of its former activities, yet its classification remains that same.' National Surety, 7 F. Supp. at 961.

Id. at 10-11, citing In re Union Guarantee & Mortgage Co., 75 F.2d 904, 985 (2d Cir. 1935); In re Peoria Life Insurance Co., 75 F.2d 777, 778 (7th Cir. 1935); In re National Surety Co., 7 F. Supp. 959, 961 (N.D.N.Y. 1934).

**D. The State's present interpretation of the Act would cause it to violate the Commerce Clause and the Full Faith and Credit Clause of the United States Constitution.**

The State's willingness to approve a contract form that allowed other states' rules to take precedence when the contract was sold in those other states is not surprising when seen against the constitutional background to its actions. Even if it had meant to regulate the content of service contracts issued to contract holders in other states, the State could not constitutionally have done so.

First, the State's interpretation violates the Commerce Clause of the United States Constitution. That provision establishes the exclusive jurisdiction of Congress to regulate "interstate commerce." That authority is pre-emptive even when it is "dormant," meaning that Congress has exercised it by not acting. Consequently, the United States Supreme Court invalidated on commerce clause grounds an attempt by the state of Texas to tax the purchase, by a company doing business in Texas, of insurance in New York. State Board of Insurance v. Todd Shipyards Corp., 370 U.S. 451, 456 (1962).

> The power of Congress to grant protection to interstate commerce against state regulation or taxation (Bethlehem Steel Co. v. State Board, 330 U.S. 767, 775-776; Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 235-236) or to withhold it ( In re Rahrer, 140 U.S. 545, 560 et seq.; Prudential Ins. Co. v. Benjamin, supra) is so complete that its ideas of policy should prevail.

The Court's decision in Todd Shipyards is notable because it was made in apparent contradiction to the McCarran Ferguson Act. But, as the Court's extensive legislative history analysis made clear, McCarran Ferguson was not intended to protect state impositions on interstate commerce.

The "dormant" commerce clause has been applied to a claim that Nebraska could regulate advertising by a Nebraska health insurer mailed to other states, Federal

8

Trade Commission V. Travelers Health Association, 362 U.S. 293 (1960); to Illinois' attempt to block a tender offer for shares of a holding company that owned an Illinois insurer, Hoylake Investments Limited, V. Washburn, 723 F. Supp. 42 (N.D. Ill. 1989); to a state's attempt to prohibit beer distributors from charging prices in its state that were higher than its neighbors', Healy v. The Beer Institute, 491 U.S. 324 (1989); and a rule prohibiting residents of a town in New York from shipping their garbage to an out-of-state landfill, C & A Carbone, Inc., v. Town Of Clarkstown, 511 U.S. 383 (1994).

The Court in Healy explained that burden on commerce must evaluated, "not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." Healy, 491 U.S. at 336. The problem of "too many regulators," anticipated in Healy, would be apparent if Illinois attempted to impose its notions of a proper service contract on residents of Massachusetts or Texas, each of which has its own rules applying to those same contracts. This Court should not permit this to happen here.

Second, the State's interpretation violates the Full Faith and Credit Clause of the United States Constitution, which says the "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. Const. art. IV, § 1. This provision's essential purpose was "to alter the status of the several States as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of others." Milwaukee County v. M.E. White Co., 296 U.S. 268, 277 (1935).

In interpreting the Full Faith and Credit clause, the Supreme Court has said that a state cannot impose its own law on wholly extraterritorial conduct merely because it has personal jurisdiction over the parties to a lawsuit in which that conduct is at issue. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 821 (1985). The Shutts case stands for the proposition that the application by a state of its own laws to determine the legal consequences of conduct occurring outside that state violates the Full Faith and Credit Clause, because it fails to give full effect to the laws in the jurisdictions where the conduct occurred. The State is trying to do just that here.

**II.    The Debtor is not the "substantial equivalent" of an insurer.**

This Court should reject the State's alternative argument, that even if the Debtor is not an insurer, it is the substantial equivalent of one under Medcare and thus is excluded from bankruptcy by § 109(b). The Illinois legislature clearly adopted the Act to modify the holding of Griffin Systems. The "substantial equivalent" test cannot be applied to overcome the State's clear statement that the laws governing insurance companies shall not apply to service contract providers.

> **A.    The "substantial equivalent" test has never been applied to override a state's classification.**

In arguing, against all common sense, that Griffin Systems still controls and that service contract providers should still be denied access to bankruptcy relief because they are the "substantial equivalent" of insurance companies, the State has lost sight, not only of the directive of its Legislature, but of the reason why § 109 excludes banks and insurance companies in the first place.

There is, in fact, no "substantial equivalent" exception in the Bankruptcy Code. If it exists (and it has been doubted), it exists as a judicially developed reality check. All

§109 says is that "domestic insurance companies" cannot file for bankruptcy. For most other businesses, access to bankruptcy relief is not only permissible, but a right that is constitutionally protected against state interference.

Tacking on an un-legislated exception to the rule of broad access to bankruptcy protection is not something courts should undertake lightly, and many courts that discuss the eligibility "tests" caveat their analysis with a warning. The Seventh Circuit did so in Medcare: "there should not really be three separate tests for ascertaining whether an entity is excluded from the protection of the Bankruptcy Code." Matter of Estate of Medcare HMO, 998 F.2d 436, 442 (7th Cir. 1993). The court in In Re Master Health Plan, 1997 U.S. Dist. LEXIS 22880 (S.D. Ga. 1997) summed up the "sagacious" holding of Medcare:

> Absent express classification under section 109 or some other federal statute, the classification of an entity should generally follow the law of the state of its incorporation, so long as that classification does not frustrate the purposes of the Code.

Another court has asserted explicitly that Congress' intent was that the list of excluded entities in § 109 "be exhaustive, not illustrative." In Re Affiliated Food Stores Group Benefit Trust 134 B.R. 215 (N.D. Tex. 1991).

Although the "less-favored" alternative tests (Re Trade Finance Bank, 163 B.R. 558 (D. S.D. 1994)) are often discussed by courts confronted with § 109 issues, we have been unable to locate any instance where one of them overrode the results of a state classification analysis, either to bar an entity from bankruptcy when state law did not clearly classify it as a bank or an insurer, or to take jurisdiction over a company which the state did so classify. Other cases where the courts discussed the "substantial equivalent" or "alternative relief" tests but decided on the basis of state classification

11

include In re Portland Metro Health, Inc., 15 B.R. 102 (Bankr. D. Ore. 1981) In re Beacon Health, Inc., 105 B.R. 178 (Bankr. D. N.H. 1989); and In re The Morris Plan Company Of Iowa, 62 B.R. 348 (N.D. Iowa. 1986).

### B.  Illinois law clearly defines "domestic insurance companies," and service contract providers are not included.

Illinois classifies a number of entities as domestic insurance companies, but not vehicle service contract providers. If the Illinois statutory scheme sought to include vehicle service contract providers as domestic insurance companies, it would have. It did not. Illinois does not classify vehicle service contract providers as insurers, and should not be able to do so at the eleventh hour now.

In contrast, the Illinois Insurance Code includes chapters titled "Domestic Stock Companies" (that apply to insurance "companies" owned by their shareholders) 215 ILCS 5/9, "Domestic Mutual Companies (insurance "companies" owned by their policyholders) 215 ILCS 5/39, and "Domestic Captive Insurance Companies" (insurance "companies" owned by their insureds). 215 ILCS 5/123C-1 et seq. Then there are "alien" insurance "companies" that, if they choose to submit to the jurisdiction of the Illinois Division of Insurance, are considered "domestic companies". 215 ILCS 5/60. There can be little doubt that each of those is a subset of the general category of "domestic insurance companies." Vehicle service contract providers are not included.

## CONCLUSION

The Court should find that the Debtor is subject to the provisions of the Bankruptcy Code, and set a hearing on the issue of the appointment of a Chapter 11 Trustee.

Profit Portfolio, et al.

By:    /s/   Mary Cannon Veed
One of its Attorneys

Mary Cannon Veed
George P. Apostolides
Arnstein & Lehr LLP
120 South Riverside Plaza, Ste. 1200
Chicago, Illinois 60606
(312) 876-7100
Firm I.D. 25188
1150394_1

13