## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Chapter 11** |
| | ) | |
| **AUTOMOTIVE PROFESSIONALS, INC.,** | ) | **No. 07 B 06720** |
| | ) | |
| **Debtor** | ) | **Hon. Carol A. Doyle** |

### MEMORANDUM OPINION

Automotive Professionals, Inc. ("API") filed a petition under chapter 11 of the Bankruptcy Code. The State of Illinois filed a motion to dismiss API's case based on five grounds: (i) API is ineligible for bankruptcy relief because it is a domestic insurance company; (ii) API's officers lacked authority to file the bankruptcy petition because a state court appointed the Illinois Director of Insurance ("Director") as conservator of API's assets before it filed its bankruptcy petition; (iii) API has no assets to administer in bankruptcy because of a prepetition assignment for the benefit of creditors; (iv) sovereign immunity protects the Director from having to turn over API's assets; and (v) the automatic stay does not apply to an action filed by the Director in state court to liquidate API under the rehabilitation and liquidation provisions of the Illinois Insurance Code.

None of the State's arguments has merit. First, API is not a "domestic insurance company" and therefore is eligible to be a debtor under the Bankruptcy Code. Second, API's directors could authorize the filing of the bankruptcy petition despite the order of conservation issued by the state court. Third, the assignment for the benefit of API's creditors does not deprive API of assets to administer in this case. Fourth, sovereign immunity does not prevent the court from requiring the Director to turn over API's assets. Finally, the police and regulatory

power exception to the automatic stay does not apply to liquidation or rehabilitation actions in state court. The State's motion to dismiss will therefore be denied.

## I.      Background and Facts

The following facts are undisputed. API is an Illinois corporation based in Schaumburg, Illinois. It sells vehicle service contracts to owners of vehicles. The purchaser pays API a fixed amount and API agrees to pay for the cost of certain vehicle repairs for a fixed period of time after the expiration of the original manufacturer's warranty. API's vehicle service contracts are sold through automobile dealerships.

API has outstanding vehicle service contracts with approximately 325,000 consumers in 49 states, including approximately 16,250 consumers in Illinois. API has been registered with the Illinois Director of Insurance as an authorized service contract provider under the Illinois Service Contract Act ("Act"), 215 ILCS 152/1 *et seq.* (2006), since at least 2002. Each year the State has approved API's contract forms.

Most states have their own version of the Act, usually based at least to some degree on the Service Contracts Model Act. These laws generally require a service contract provider to demonstrate its financial ability to perform the contracts either through insurance, reserves or some other means. API's vehicle service contracts are backed by a combination of funds on deposit in various reserve accounts and insurance policies. The amount and type of insurance coverage or other financial backing for each of API's vehicle service contracts is based on the law of the state in which the vehicle service contract is sold.

-2-

If a company selling service contracts in Illinois satisfies the financial requirements of the Act through an insurance policy, the policy must provide "first dollar coverage" - meaning that it covers any liability that the service contract provider has under the service contract with the customer. All of API's vehicle service contracts sold in Illinois are backed by first dollar insurance coverage issued by Marathon Financial Insurance Co., Inc. ("Marathon"), Allstate Insurance Company or Travelers Insurance Company. Marathon also provides less comprehensive coverage for many of API's vehicle service contracts sold in states that do not require first dollar coverage.

For the last three years, API has operated at a cash deficit. There is now a cash shortfall of approximately $9 million in the reserve accounts relating to some of the vehicle service contracts. API's situation is complicated by provisions of the Marathon insurance policies that apply to vehicle service contracts sold in states that do not require first dollar coverage. Marathon contends that its coverage does not attach to cover claims until all funds placed in API's reserve accounts in the aggregate have been paid out for repair costs. Marathon may also assert that it has no obligation to pay on the non-first dollar policies for other reasons.

In the fall of 2006, API's management determined that it could not fix its financial problems and that it should wind down its operations. API executed an assignment of its assets for the benefit of creditors on February 15, 2007. The assignee is Michael Kayman. API's assets were transferred to the API Creditors Trust administered by Mr. Kayman for the purpose of liquidating the assets and paying out the proceeds to creditors.

On March 2, 2007, Michael McRaith, the Illinois Director of Insurance, filed a complaint against API and the API Creditors' Trust in the Circuit Court of Cook County. He obtained an

-3-

Order of Conservation and Injunctive Relief ("Order of Conservation"), effectively freezing

Kayman's activities as API's assignee. The complaint was brought in part under the Act. On

April 4, 2007, McRaith filed a Complaint for Rehabilitation in state court seeking to

"rehabilitate, wind down and terminate" the business and affairs of API under the rehabilitation

and liquidation provisions of the Illinois Insurance Code. There has been no adjudication of any

issues in connection with this second complaint.

API filed its bankruptcy petition in May 2007. The State filed its motion arguing that the

case should be dismissed and the Director should be permitted to liquidate API under the

rehabilitation and liquidation provisions of the Illinois Insurance Code.

## II.    Eligibility for Relief Under the Bankruptcy Code

The primary issue raised in the State's motion is whether API is eligible to be a debtor

under the Bankruptcy Code. The State argues that API is a "domestic insurance company" and

therefore not eligible to be a debtor under § 109(b)(2) and (d) of the Bankruptcy Code, 11 U.S.C.

§ 109(b)(2) and (d). Section 109(b) provides that "[a] person may be a debtor under chapter 7 of

this title only if such person is not - ... (2) a domestic insurance company ...." Section 109(d)

provides that "[o]nly ... a person that may be a debtor under chapter 7 of this title ... may be a

debtor under chapter 11 of this title." Thus, if API is a domestic insurance company, it may not

be a debtor under either chapter 7 or chapter 11 of the Bankruptcy Code.

As a preliminary matter, the State argues that the court does not have subject matter

jurisdiction over bankruptcy cases involving domestic insurance companies. However, the

question is not one of jurisdiction - the court has subject matter jurisdiction over all cases filed

under the Bankruptcy Code.  See Promenade Nat'l Bank v. Phillips (Matter of Phillips), 844 F.2d

230, 236 n. 2 (5th Cir. 1988).  Instead, eligibility for relief under the Bankruptcy Code is a

question of substantive bankruptcy law.  See id.

Congress did not define "domestic insurance company" in the Bankruptcy Code.  To fill

this gap, the Seventh Circuit adopted the "state classification" test  to determine whether a debtor

is a domestic insurance company.  Matter of Estate of Medcare HMO, 998 F. 2d 436, 442 (7th

Cir. 1993); Matter of Cash Currency Exchange, Inc. (Cash Currency Exchange, Inc. v. Shine),

762 F.2d 542, 548 (7th Cir. 1985).  Under this test, the court must determine (1) whether a debtor

is considered a domestic insurance company under the law of the state in which it is

incorporated, and if not, (2) whether the debtor is the "substantial equivalent" of an insurance

company under state law.  Id. at 444.  The court must then consider whether the state

classification is consistent with the purposes of the Bankruptcy Code.  Id. at 442.  Thus, the first

question to be decided is whether Illinois law treats API as an insurance company.

The Act provides an exemption from compliance with the Illinois Insurance Code for

service contract providers who comply with the Act.  The State argues that API is not exempt

from the Insurance Code because it has not complied with the Act.  It also asserts that API is the

substantial equivalent of  insurance company.  API contends that it is not an insurance company

because the Act completely exempts service contract providers from insurance regulation

whether or not they comply with it, and because API has complied with the Act in any event.

For the reasons discussed below, the court concludes that the Act provides an exemption

to service contract providers who comply with the financial and registration requirements of the

Act.  API has complied with those provisions and is therefore exempt from compliance with and

-5-

is not subject to any provision of the Illinois Insurance Code. It therefore is not classified as an

insurance company under Illinois law for purposes of the state classification test.


A.    **Illinois Service Contract Act**

The Act provides that service contract providers complying with the Act are not subject

to and need not comply with any provision of the Illinois Insurance Code. It sets forth a statutory

framework under which a service contract provider can do business in Illinois and not be treated

as an insurance company. Section 5 of the Act states that "'service contract provider' means a

person who is contractually obligated to the service contract holder under the terms of the service

contract." It then specifically states that "[a] *service contract provider does not include an*

*insurer.*" 215 ILCS 152/5 (emphasis added). Section 10 of the Act, entitled "Exemptions,"

provides that service contract providers "complying with this Act" are not required to comply

with and are not subject to any provision of the Illinois Insurance Code. 215 ILCS 152/10.

Sections 15 and 25 contain the financial and registration requirements for service contract

providers to do business in Illinois. Section 15, entitled "Financial requirements," provides that

no service contract shall be issued, sold or offered for sale in Illinois unless one of the three

conditions specified is satisfied. 215 ILCS 152/15. A service contract provider must either have

first dollar insurance coverage for its service contracts, meet certain reserve requirements or have

a net worth of at least $100 million. Id. Section 25 of the Act provides the registration

requirements for service contract providers. It requires service contract providers to register with

the State by providing specified information, including a statement indicating the provision of

-6-

§ 15 under which the service contract provider qualifies to do business in this state and a copy of all service contracts to be sold in the state.

Sections 20 ("Reimbursement policy; required provisions"), 30 ("Required service contract disclosures"), 35 ("Cancellations and refunds") and 40 ("Incidental benefits") all govern the contents of the contracts and the rights of consumers under those contracts. Section 45 imposes record keeping requirements on service contract providers, and § 50 contains the examination and enforcement provisions. Section 50 allows the Director to enforce a violation of the Act by various means, including issuing orders, prohibiting service contract providers from selling in violation of the Act, imposing civil penalties, or bringing an action in state court. The enforcement powers in § 50 do not incorporate the liquidation and rehabilitation provisions of the Insurance Code.

Read as a whole, these provisions create a statutory scheme under which service contract providers who meet the financial and registration requirements of §§ 15 and 25 are exempt from the Insurance Code but must comply with the specific requirements of the Act regarding their obligations to consumers. If they violate the specific provisions relating to service contracts (§§ 20, 30, 35, 40 or 45), the Director of Insurance may use the array of enforcement powers provided in § 50 to force compliance but they do not lose their exemption.

API argues that the definition of a service contract provider in § 5 alone makes all service contract providers exempt from the Insurance Code. It therefore asserts that service contract providers are never treated as insurers under Illinois law. Section 5 of the Act describes a service contract provider and then specifically excludes insurers from that definition by providing that "[a] service contract provider does not include an insurer." This exclusion makes clear that

-7-

companies operating as insurance companies (presumably those registered as insurance

companies in Illinois) do not have to comply with the Act. It also suggests that service contract

providers are not insurers for purposes of Illinois law. API contends that this sentence

conclusively excludes any service contract provider from being treated as an insurer under

Illinois law. Although the legislature could have stated the proposition more directly (i.e., it

could have simply said "a service contract provider *is not* an insurer" instead of saying "a service

contract provider *does not include* an insurer"), the language supports API's interpretation until

§ 10 is taken into account.

Section 10, entitled "Exemptions," provides that service contract providers "complying

with the Act" need not comply with and are not subject to any provision of the Insurance Code.

This provision makes clear beyond doubt that service contract providers complying with the Act

are not insurers under Illinois law. But it also suggests that service contract providers not

complying with the Act are not exempt from the Insurance Code. Because the exemption is for

service contract providers "complying with the Act," this provision does not create a blanket

exemption for all service contract providers regardless of whether they comply with the Act.

This specific requirement in § 10 that service contract providers comply with the Act to qualify

for the exemption is sufficient overcome the debtor's argument that the exclusion of insurers

from the definition of service contract provider in § 5 was intended to eliminate the possibility

that a service contract provider would ever be treated as an insurer under Illinois law.

Instead, a more reasonable interpretation that gives meaning to each of these provisions

is that service contract providers who meet the financial requirements of § 15 and register under

§ 25 are exempt from the Insurance Code. These two provisions contain the ground rules for

-8-

selling service contracts in Illinois. They create three alternatives for service contract providers
to demonstrate the financial ability to perform their contracts that would justify the exemption
from the Insurance Code provided in § 10. Complying with one of these three alternatives would
satisfy the legislature's apparent desire to protect consumers from service contract providers who
do not have the financial ability to perform without requiring the providers to comply with the
extensive regulatory system imposed on insurance companies. While this interpretation leaves
open the question of what was intended by the exclusion of insurers from the definition of a
service contract provider in § 5, that oddly phrased exception to a definition must give way to the
clear implication of § 10 that providers must comply with the Act to be exempt from the
Insurance Code.

The State would go much farther, arguing that if a service contract provider violates any
provision of the Act, it loses the exemption in § 10 and is immediately subject to the Insurance
Code.[1] While § 10 does not expressly limit the provisions with which a service contract provider
must comply to be exempt from the Insurance Code, neither does it provide that a failure to
comply with any provision of the Act results in a loss of the exemption. In interpreting an
Illinois statute, a court must ascertain the legislative intent, first looking to the language of the
statute, examining the language of the statute as a whole, and considering each part or section in
connection with every other part or section. Antunes v. Sookhakitch, 588 N.E.2d 1111, 1114 (Ill.
1992). If the legislature had intended that any violation of the Act would make a service

_____

[1]In oral argument, the State conceded that not every violation of the Act results in a loss
of the exemption from the Insurance Code. However, it was unable to draw any rational line
between violations that destroy the exemption and violations that invoke only the enforcement
provisions in § 50.

contract provider subject to the Insurance Code, there would be no need for the enforcement provisions in § 50. Service contract providers violating the Act would automatically be subject to all of the powers of the Director under the Insurance Code. The inclusion of the enforcement provisions in § 50 of the Act demonstrates that the Illinois legislature did not intend that any violation of the Act would render a service contract provider non-exempt and therefore subject to the Illinois Insurance Code.

The only interpretation of the Act that gives meaning to all of its statutory provisions is that once a service contract provider complies with the financial requirements of § 15 and registers according to § 25, it is exempt from compliance with the Insurance Code and is not considered an insurer under Illinois law. If an exempt service contract provider fails to comply with the other requirements of the statute, it is not then treated as an insurer but instead is subject to the enforcement provisions in § 50. Therefore, for purposes of applying the state classification test to determine whether API is classified as an insurer under Illinois law, the court must determine whether API has complied with the financial and registration provisions of the Act.

**B.    API Is Exempt Under § 10 of the Act**

It is undisputed that API has first dollar coverage for all service contracts sold in Illinois, and that is has complied with the registration requirements of the Act. The Director has approved API's registration to sell service contracts in Illinois since at least 2002, and has approved the form contracts API has used in every year since at least 2002. Thus, the Director has already determined that API is in compliance with the registration and financial requirements of the Act. Nonetheless, the State argues that API is not exempt from compliance with the

-10-

Insurance Code because it has failed to comply with two provisions of the Act: (1) the requirement in § 15(1) of first dollar insurance coverage for all contracts issued in the state, and (2) the cancellation requirements in Section 35. Neither argument is persuasive.

### 1. The Act Does Not Require First Dollar Coverage for Contracts Sold in All States

First, the State argues that API is not exempt from the Illinois Insurance Code because it did not comply with the financial requirements in § 15 of the Act. This provision gives service contract providers three ways to meet the financial requirements of the Act: (1) it can be insured with first dollar coverage under a "service contract reimbursement insurance policy" issued by an insurer authorized to do business in Illinois, 215 ILCS 152/15(1)(A); (2) it can maintain a funded reserve account for its obligations under service contracts issued and outstanding in the state, which shall be not less than 40% of the gross consideration received less claims paid for all service contracts sold and then in force, 215 ILCS 152/15(2)(A); or (3) it can maintain a net worth or stockholders' equity of $100 million. 215 ILCS 152/15(3)(A). API chose the first option - to obtain a service contract reimbursement insurance policy under § 15(1)(A).

API has first dollar coverage only for contracts sold in Illinois and the six other states requiring such coverage. The State argues that § 15(1)(A) requires API to have first dollar coverage for all contracts API "issued" anywhere in the world, not just those sold in Illinois. Section 15 provides that "[n]o service contract shall be *issued, sold or offered for sale in this State* unless ... (1)(A) the service contract provider is an insured under a service contract reimbursement insurance policy issued by an insurer ... and providing that the insurer will pay ...

-11-

all sums that the service contract provider is legally obligated to pay ... under the service

contracts issued or sold by the service contract provider." 215 ILCS 152/15. The State contends

that "issued ... in this State" means *any* contract issued by service contract providers like API

who are headquartered in Illinois to customers located anywhere in the world. It asserts that all

contracts API enters into are necessarily "issued" from its headquarters in Illinois. It also argues

that "issued" in the state must mean something different than "sold" in the state or the word

"issued" in § 15 would be rendered superfluous.

Thus, the pivotal question is what is meant by the word "issued" in the prefatory

language of § 15. "Issued" is not defined in the Act and Illinois courts have not construed it.

Courts interpreting this word in the context of insurance contracts have held that a contract is not

issued until it is received by the purchaser. As the court explained in <u>Homestead Fire Ins. Co. v.

Ison</u>, 65 S.E. 463, 465 (Va. 1909), "[l]exicographers define 'issuance' to be the act of putting,

sending, or giving out. The legal definition of the word is practically to the same effect – to send

out officially, to deliver for use, to put into circulation." The court noted that "'Issued,' as used

in reference to the issuance of an insurance policy, means when the policy is made and delivered,

and is in full effect and operation." <u>Id</u>. The court concluded that a policy insuring goods for a

specific number of days was not issued until delivered to the insured. <u>Id</u>.

The Seventh Circuit applied a similar definition of "issued" from Webster's Dictionary -

the "act of sending out, or causing to go forth, delivery," in <u>Prestige Cas. Co. v. Mashburn</u>, 612

F.2d 1048, 1049 (7th. Cir. 1980). The court held that an endorsement to a policy changing the

insured vehicle was never "issued" because it was never sent to the insured party. Thus, although

the common definition of the word "issued' includes references both to sending out and receipt,

-12-

courts have held that receipt of a contract is necessary for an insurance contract to be issued. This interpretation of "issued" supports API's argument that service contracts are issued in the place where the purchaser is located, because the contract (or changes to contract) are not effective until received by the purchaser at the location of the insured. A vehicle service contract could therefore be viewed as being issued at the location of the recipient.

However, some courts applying choice of law provisions have assumed that insurance contracts are issued from the domicile of the insurer. See Diamond State Ins. Co. v. Chester-Jensen Co., Inc., 611 N.E.2d 1083, 1094 (Ill. App. Ct. 1993) ("place of issuance" found to be the insurers' home office). Thus, case law interpreting the word "issued" in other contexts is not particularly helpful in determining whether the legislature intended to regulate all contracts sold by service contract providers headquartered in Illinois to persons outside the state.

As noted above, when construing an Illinois statute, if the legislative intent of a provision is not clear from the words of the statute, the court must look to the other provisions of the act, the statute as a whole, and the legislative history to ascertain the legislature's intent. See Kunkel v. Walton, 689 N.E.2d 1047, 1053 (Ill. 1997); Antunes v. Sookhakitch, 588 N.E.2d at 1114. Here, other provisions of the Act, the Act as a whole, the Director's own previous interpretation of the Act and the limited legislative history support the conclusion that the legislature intended to requires first dollar insurance coverage only for contracts sold or issued to persons located in Illinois.

First, other provisions of the Act demonstrate that it was not intended to apply to contracts sold outside the state of Illinois. The enforcement provisions in § 50 contain language showing a clear intent to limit application of the Act to protect contract purchasers in Illinois.

-13-

Section 50(a) provides that the Director may conduct examinations "'to enforce this Act and protect service holders *in this State*." 215 ILCS 152/50(a) (emphasis added). Section 50(b) provides that the Director "may take action that is necessary or appropriate to enforce the provisions of this Act and the Director's rules and orders and to protect service contract holders *in this State*." 215 ILCS 152/50(b) (emphasis added). It further states that, if the a service contract provider engages in a pattern or practice that violates the Act and the Director reasonably believes threatens to render the service contract provider insolvent or cause irreparable loss or injury to "the property or business of any person or company located *in this State*," the director may take certain actions. Id. Thus, the enforcement provisions in § 50 provide strong support for the view that the Act is intended to apply only to sales of contracts in Illinois. Section 25 of the Act also requires that a service contract providers submit only copies of contracts "to be sold in this State." 215 ILCS 152/25(a)(4). If the legislature intended to regulate contracts sold in other states, it would have required service contract providers to submit those contracts as well.

In addition, the legislative history of the Act shows that the Illinois legislature was following the Model Act and was aware that this kind of statute was being enacted "nationally," meaning in states across the nation. Ill. House of Representatives, 90th Gen. Assemb., Transcr. Deb. (May 20, 1998). Applying the Act to impose Illinois' strict first dollar insurance requirements on sales made in other states is inconsistent with the laws of each of those states, which provide their own financial requirements for service contract providers. The State's interpretation of § 15 would create a highly anomalous situation in which a service contract provider headquartered in Illinois would have to comply with Illinois' more strict financial

requirements to sell service contracts in other states in which the legislature chose not to impose those restrictions on contracts sold to its own citizens. There is no indication in the legislative history of any intent to affect the sale of service contracts outside of Illinois. Id. It shows that legislators had serious concerns about the impact of the Act on small businesses in the state, but absolutely no awareness that the Act might be construed to apply to sales outside the state. Id.

In addition, limiting the phrase "issued, sold or offered for sale in this State" to contracts sold or issued to by purchasers in Illinois is consistent with the use of the word "issued" in the Model Act. As noted above, the Act contains many provisions from the Model Act. The Model Act assumes that service contracts are exempt from the state insurance code under a different statute. Section 1(D) of the Model Act then provides that it shall not apply to service contracts "issued at the point of sale" or within 60 days of the original purchase date of the property, which strongly suggests that the service contract is "issued" in the state in which the sale is made. Section 3 of the Model Act contains provisions very similar to the provisions of § 15 of the Act, including the introductory language that service contracts shall not be "issued, sold or offered for sale in this state" unless certain requirements for doing business are met, and then contains language similar to § 15(1)(A) regarding reimbursement insurance policies. The word "issued" in Section 3 of the Model Act presumably has the same meaning that it had in Section 1(D) of the Model Act. Section 1(A) of the Model Act also provides that one of its purposes is to "create a legal framework within which service contracts may be sold *in this state*." There is no indication in the Model Act of any intention that it apply to contracts sold outside of the enacting state. To the contrary, the drafters presumably intended that each state would enact its own law based on

-15-

the Model Act so there would be no need for any state to regulate the contracts sold in any other state.

The court's interpretation of the meaning of "issued, sold or offered for sale in this State" in § 15 is consistent with the language of the contracts used by API (DX 5). The front page of the contract provides, "[c]overage begins on the Contract Purchase Date and at 0 miles. Coverage expires according to the time of the term of the Contract or when the odometer reaches the term of the coverage selected, whichever occurs first." The contract is signed only by the dealer's representative and the "applicant" or customer. Thus, the contract can be viewed as being "issued" at the time and place of purchase by the customer at a car dealership. A "note" on the first page of the contract that says that "[t]his application together with your Contract Confirmation and Terms and Conditions constitute your verified and accepted Contract by the Administrator." Under the Prestige Casualty analysis, to the extent the confirmation notice contained terms or conditions that varied from the original terms on the contract form, those additional terms and conditions would not be effective until they were received by the purchaser - again at the location of the purchaser. See 612 F.2d at 1050. Thus, API's contract language supports its argument that its contracts are issued at the point of sale at the dealerships.

The Director's own actions in approving API's registration and contracts over the years also supports the court's interpretation of § 15. API's contract form contains modifications to the principal contract terms based on the state law requirements of each state in which API sold contracts. Pages 5 through 7 of the contract form (Debtor's Exhibit 5) contains a state-by-state listing of the changes to the preceding contract language dictated by the requirements of each state in which the contracts are sold. Each year since at least 2002 the Director approved API's

-16-

contract forms, API's registration and the Marathon policies backing the contracts (which

provided first dollar coverage only in Illinois and six other states). If the Director believed that

API needed first dollar coverage for every contract it sold anywhere, it would have required API

to expand Marathon's first dollar coverage to contracts sold in all states before approving or

renewing API's registration.

The State argues that its interpretation of "issued" is supported by the wording of the

three options in the financial requirements provisions of § 15. It argues that only the second

option allowing a funded reserve account contains any express language limiting its coverage to

contracts "issued and outstanding in this State." The State argues that by including this specific

language in the second option only the legislature evidenced an intent that the other two options

be followed for all contracts issued by any service contract provider located in Illinois, not just

for contracts issued to residents of Illinois. This argument has no merit for several reasons.

First, it fails to recognize that the introductory phrase of Section 15 makes it applicable

to service contracts "issued, sold, or offered for sale *in this State*" for all three options, not just

the second "reserve account" option. 215 ILCS 152/15 (emphasis added). There was no need to

restate this limitation in each subparagraph of § 15. Second, the "issued and outstanding in this

State" language in § 15(2)(A) does not help explain in any way the meaning of the word

"issued." It simply repeats the word "issued" that was already used in the introductory phrase of

§ 15, and adds the phrase "and outstanding." The "issued and outstanding in this State"

language, which comes from the Model Act, was most likely added only to the second option to

address issues that would arise only with respect to calculating the proper reserve amount, which

must be continually updated to take into account payments made under contracts and the

-17-

expiration of contracts. This language does not support the State's theory that any contract sold
by a service contract provider domiciled in Illinois is "issued in Illinois."

Third, the State has failed to proffer any rational reason why the legislature would give
service contract providers worth less than $100 million two ways to demonstrate a financial
ability to perform their contracts, but would make one method apply to any contract sold
anywhere in the world while the other method applies only to contracts sold in the state. There is
no logical reason why the legislature would require a service contract provider to maintain
reserves relating only to contracts "issued" in the state but require it to buy first dollar insurance
policies for all policies it "issued" both inside and outside the state. If the legislature had
intended such a disparate application of these two alternatives, it would have expressed it in clear
language. See Antuned v. Sookhakitch, 588 N.E.2d at 1115 ("Statutes should be construed as to
give them a reasonable meaning and in the most beneficial way to prevent absurdity or
hardship.").

Considering the language of § 15, the other provisions of the Act, the purpose of the Act,
the context provided by the Model Act and the limited legislative history, the most reasonable
interpretation of § 15 is that it was intended to apply only to service contracts sold or issued to
persons located in Illinois. It is simply unreasonable to give the word "issued" in § 15 the
extremely broad application the State advocates without some specific evidence of a legislative
intent to regulate sales of contracts to residents of other states.

For all of these reasons, the court rejects the State's contention that API must have first
dollar reimbursement insurance coverage for every contract it sells to anyone located anywhere to
comply with the financial requirements of § 15(1)(A). Instead, the court concludes that API

-18-

must have first dollar coverage only for contracts sold in Illinois. Because it is undisputed that API has first dollar coverage for all of the contracts it sold in Illinois, API has complied with § 15. It is also undisputed that API has complied with the registration provisions in § 25 of the Act. The court therefore concludes that API is exempt from compliance with and is not subject to any provision of the Illinois Insurance Code.

### 2.    Other Alleged Violations of the Service Contract Act

The State also argues that API is not exempt from compliance with the Illinois Insurance Code because it violated § 35 of the Act. The State contends that § 35, which permits service contract holders to cancel their contracts, implicitly prohibits service contract providers from unilaterally canceling contracts. The State argues that API unilaterally cancelled the majority of its contracts in violation of § 35 when Kayman, API's assignee, sent a notice to dealers and agents stating that "[n]o further claims against API Vehicle Service Contracts ... will be authorized or approved [after] February 19, 2007." The State asserts that this action took API outside of any exemption provided by the Act and made it subject to the provisions of the Insurance Code.

The State's argument lacks merit for at least two reasons. First, as discussed above, violation of any provision other than the registration and financial requirements of §§ 15 and 25 do not result in the loss of the exemption. Instead, the Director may use the enforcement provisions in § 50 if he believes § 35 has been violated. Second, § 35 does not prohibit service contract providers from refusing to perform or cancelling service contracts in any event. It requires that service contracts clearly state that the holder may cancel the contract. It then spells

out the parties' rights in the event that the contract holder cancels the contract. Section 35 does

not prohibit service contract providers from cancelling contracts or refusing to authorize or

approve claims under contracts. Contrary to the state's suggestion, the Act does not attempt to

regulate all aspects of service contracts. Instead, it regulates only those specific areas addressed

in the statute, leaving the service contract to govern the rest of the relationship between the

parties. Although it is possible that Kayman's action was a breach of contract, it was not a

violation of the Act. Thus, even if a violation of § 35 could result in a loss of exemption from

compliance with the Insurance Code, API did not violate § 35 when Kayman sent the February

19 notice.

The State also argues that the assignment for benefit of creditors itself violated the Act

and caused a loss of any exemption from the Insurance Code that might have previously applied

to API. However, the State has not identified any provision that the assignment violated or

shown how the assignment results in a loss of the exemption from the Insurance Code.

Finally, the State argues that API should be deemed non-exempt under § 10 because it

alleges that Marathon is not in fact paying claims made under its first dollar policies covering

API's service contracts sold in Illinois. Thus, the State contends that an alleged breach of

contract by API's reimbursement insurance carrier results in API losing its exemption under § 10

of the Act. This argument is flawed. First and most importantly, nothing in the Act even

remotely suggests that a service contract provider whose insurer fails to honor its contractual

obligations loses the exemption provided in § 10. The court concludes that any such breach

would not result in a loss of exempt status by the service contract provider. In addition, the State

raised this new factual matter in its final brief, which was too late for the introduction of new

-20-

evidentiary materials on the motion. The State supported its assertion merely by allegations in complaints filed in state court by third parties, which have no evidentiary value in any event.

The State has failed to raise any valid basis for concluding that API is not entitled to the exemption from the Insurance Code provided in § 10 of the Act. Under § 10, API is exempt from compliance with and is not subject to any provision of the Insurance Code. The court therefore concludes that Illinois law does not classify API as an insurer.

### C.    API Is Not the Substantial Equivalent of an Insurance Company

Under the state classification test, if the court concludes that API is not classified as an insurer under state law, the court must then analyze whether API is the substantial equivalent of an insurer under state law. HMO Medcare, 998 F.2d at 442. Courts examine four factors to determine whether a debtor is the substantial equivalent of an insurance company: (1) whether the debtor has the essential attributes of an insurance company; (2) the degree of state regulation of the debtor; (3) the existence of a state statutory scheme for liquidation or rehabilitation, and (4) the public or quasi-public nature of the business. Id. at 445. Applying these factors to API, the court concludes that it is not the substantial equivalent of an insurance company under Illinois law.

The only factor that potentially weighs in favor of finding that API is the substantial equivalent of an insurer under Illinois law is the first factor - whether API has the "essential attribute" of an insurance company under state law. See Medcare HMO, 998 F.2d at 444; Cash Currency, 762 F.2d at 548. As the Medcare court noted, "The essential attribute of an insurance company under Illinois law, and the attribute prompting deference to state regulation, is the

-21-

assumption of a third party's risk for a premium." Medcare HMO, 998 F.2d at 445 (citing

Griffin Systems, Inc. V. Washburn, 505 N.E.2d 1121 (Ill. App. Ct. 1987)).

Under most of API's contracts, API assumes the risk that the service contract purchaser

will need covered repairs during the contract period in exchange for a payment - the purchase

price of the service contract. In fact, the Illinois Appellate Court has held that service contracts

similar to those sold by API are insurance contracts covered by the Illinois Insurance Code. See

Griffin Systems, 505 N.E.2d at 1124. Thus, before the Act was enacted, Illinois law classified

service contracts as insurance contracts, so service contract providers would most likely have

been considered insurers.

However, eleven years after Griffin Systems was decided, the Illinois legislature created

the statutory exemption from the Insurance Code in § 10 of the Act. The Act is now the

controlling Illinois law regarding the classification of service contract providers, and it provides

in effect that service contract providers are not insurers if they comply with the Act. Therefore,

although service contracts providers like API have an essential attribute of insurance companies,

they are not the substantial equivalent of insurers under Illinois law because of the exemption in

the Act.

The exemption in § 10 of the Act is also determinative of the second factor in the

substantial equivalent analysis - whether API is subject to state statutory procedures for

liquidation or rehabilitation. Section 10 renders the extensive rehabilitation and liquidation

provisions in the Illinois Insurance Code inapplicable to service contract providers complying

with the Act. As discussed above, § 10 specifically provides that service contract providers

complying with the Act "are not required to comply with and *are not subject to any provision of*

-22-

*the Illinois Insurance Code.*" 215 ILCS 152/10 (emphasis added). The legislature could not have been more clear in making the entire Insurance Code inapplicable to complying service contract providers.

The enforcement provisions in § 50 of the Act confirm that the rehabilitation and liquidation provisions of the Insurance Code do not apply to service contract providers. Section 50 gives the Director powers to examine service contract providers and take certain actions to enforce the Act. 215 ILCS 152/50. The Director may take one of four specified actions: (1) issue orders to cease and desist, (2) issue orders prohibiting the provider from selling contracts in violation of the Act, (3) issue orders imposing civil penalties, and (4) issue any combination of the foregoing. 215 ILCS 152/50(b). Section 50 specifically authorizes the Director to issue these orders when "the service contract provider engages in a pattern or practice of conduct that violates this Act and that the Director reasonably believes threatens to render the service contract provider insolvent or cause irreparable loss or injury to the property or business of any person or company located in this State." Id. Thus, the Act explicitly recognizes the possibility of a service contract provider becoming insolvent but does not permit the Director to take action against the provider under the rehabilitation and liquidation provisions of the Insurance Code.

As noted in Medcare HMO, the Illinois legislature expressly applied the rehabilitation and liquidation provisions of the Illinois Insurance Code to HMOs. 998 F.2d at 443. The legislature's failure to do the same with respect to service contract providers, together with the exemption language in § 10 and the limited remedies provided in § 50 to address insolvency, all support the conclusion that the rehabilitation and liquidation provisions of the Insurance Code do

-23-

not apply to service contract providers. Thus, the second factor in the substantial equivalency analysis weighs heavily against concluding that service contract providers are the substantial equivalent of insurers under Illinois law - a comprehensive statutory alternative to the Bankruptcy Code does not exist in this case.

The State argues that API is subject to the rehabilitation and liquidation provisions of the Insurance Code for two reasons. First, it argues that API is not exempt from the Insurance Code because it has not complied with the financial requirements of § 25 of the Act and it violated § 35 of the Act when Kayman issued the February 19 notice. It therefore argues that the exemption in § 10 does not apply. However, as discussed above, the court has rejected both of the State's arguments under §§ 10 and 25 of the Act and concluded that API is exempt from compliance with the Insurance Code. Therefore, the rehabilitation provisions of the Insurance Code do not apply to API.

Second, the State argues that the Director has power under §§ 187 and 188 of the Insurance Code to rehabilitate or liquidate API, which is independent of his power derived from §50 to enforce the provisions of the Act. Section 187 provides that the rehabilitation and liquidation provisions of the Insurance Code "shall apply to every corporation ... which is subject to examination, visitation or supervision by the Director under ... any law of this State..." 215 ILCS 5/187(1). Section 188 then sets forth the grounds for rehabilitation, several of which might apply to API. 215 ILCS 5/188. The State asserts that since the Director has the right to inspect all service contract providers and grounds for rehabilitation exist, the Director has the right to initiate rehabilitation or liquidation proceedings against API in state court under the Insurance Code.

-24-

The State's reading of these provisions would be correct were it not for the exemption in § 10 of the Act and the limited enforcement powers given to the Director in cases of insolvency or threatened insolvency under § 50(b) of the Act. The specific provisions of the Act dealing with service contract providers limit the general rule set forth in the Illinois Insurance Code. "It is a fundamental rule of statutory construction that where there exists a general statutory provision and a specific statutory provision, either in the same or another act, which both relate to the same subject, the specific provision controls and should be applied." People v. Villarreal, 604 N.E.2d 923, 928 (Ill. 1992); see also People ex rel. Myers v. Penn. R.R. Co., 166 N.E.2d 86, 90 (Ill. 1960); De Witt County v. Greene, 151 N.E. 372, 373 (Ill. 1926). Section 187 of the Insurance Code is a general statutory provision pertaining to the Director's receivership powers over all entities that he examines and supervises, including service contract providers. The exemption in § 10 of the Act and the omission of liquidation powers in § 50 are specific statutory provisions pertaining only to service contract providers. Since the specific provisions must prevail and be treated as an exception to the general provision, §§ 10 and 50 of the Act control over § 187 of the Insurance Code. Service contract providers complying with the Act therefore are not subject to the Director's power to rehabilitate or liquidate under § 187 of the Illinois Insurance Code.

Neither of the final two factors in the "substantial equivalent" test support the State's position that API is the substantial equivalent of an insurer under Illinois law. Service contract providers are not subject to extensive regulation under the Act. Instead, the Act provides a relatively simple regulatory scheme - just ten operative provisions - that govern service contracts sold in Illinois. The limited nature of this regulation is abundantly clear when the Act is

-25-

compared to the extensive regulation of HMO's in Illinois. As the Seventh Circuit recognized in Medcare HMO, "HMOs are subject to extensive state regulation.... The more extensively an entity is regulated under state law, the stronger the state interest and the more likely it is that Congress intended to exclude the entity from bankruptcy relief and leave to the states the business of winding up." 998 F.2d at 446 (citing Cash Currency, 762 F.2d at 551). The court further noted that HMOs in Illinois "are subject to numerous provisions comparable or identical to those in the Insurance Code, and – most importantly – are subject to the same procedures for liquidation and rehabilitation." See 215 ILCS § 125/5-3; see also Medcare HMO, 998 F.2d at 446 n. 11. It therefore concluded that HMOs were the substantial equivalent of insurance companies under Illinois law. By contrast, in this case, API is not subject to the extensive regulation of insurers under the Insurance Code or HMOs under the HMO Act. The relative lack of regulation of service contract providers supports the conclusion that service contract providers are not the substantial equivalent of insurers under Illinois law.

Finally, the fourth factor in the "substantial equivalent" analysis, whether API's business is public or quasi-public in nature, also weighs in API's favor. The length to which a state has or has not gone to protect affected constituents is a key indicator of whether a business is public in nature. Medcare HMO, 998 F.2d at 446; Cash Currency, 762 F.2d at 551 ("The more comprehensive the liquidation scheme, the stronger the indication that the state sees a strong public interest in direct governmental supervision and control of the liquidation or dissolution of the institution."). The fact that Illinois does not subject service contract providers to extensive regulation is again relevant. For example, in Medcare HMO, a specific statutory provision governing distribution priority in a liquidation and the existence of the HMO Guaranty Fund to

protect enrollees under the HMO Act demonstrated the public nature of HMOs. See 998 F.2d at

446. No similar protections are afforded to purchasers of service contracts under the Act,

reflecting that the legislature views service contracts as much less important and public in nature

than health insurance contracts.

After weighing each of the four factors in the "substantial equivalent" test, the court

concludes that service contract providers are not the substantial equivalent of insurers under

Illinois law. Even though service contract providers accept the risk of third party purchasers for

payment of a premium, the Illinois legislature has chosen not to treat them as insurers, has not

created a rehabilitation or dissolution scheme for them, and has not treated them as public entities

warranting extensive regulation. API therefore is neither classified as an insurer nor treated as

the substantial equivalent of an insurer under Illinois law.


D.     No Conflict with Federal Policy

In formulating the test for determining whether a debtor is eligible for relief under the

Bankruptcy Code, the Medcare HMO court held that while the state classification analysis is

usually determinative, courts must be careful to insure that federal policy is not defeated by

deferring to state law. 998 F.2d at 442. Congress intended to create one uniform bankruptcy law

to apply to all of the states. The exclusions enumerated in § 109(b) of the Bankruptcy Code are

meant to be limited exceptions to the general right to file for federal bankruptcy protection that

should be strictly construed. Cash Currency, 762 F.2d at 552 ("The general rule of statutory

construction is that the enumeration of specific exclusions from the operation of a statute is an

indication that the statue should apply to all cases not specifically excluded."). "The very point

of federal bankruptcy law is to substitute for a set of potentially varying preferences and priorities arising under other laws, a single rational federal system for dealing with legitimate claims that exceed in amount a limited set of assets." Tringali v. Hathaway Mach. Co., 796 F.2d 553, 562 (1st Cir. 1986).

States cannot undermine Congressional intent by broadly classifying entities that are not insurance companies as insurance companies. Federal law preempts state law if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 281 (1987). If the state classification test were applied blindly, a state's expansive classification of entities as insurers or other excluded entities would defeat Congressional intent to permit all entities to file for bankruptcy except those specifically excluded in § 109(b). Courts must therefore make sure that the results of the state classification analysis do not defeat federal bankruptcy policy.

In this case, permitting API to be a debtor is consistent with federal bankruptcy policy. The Illinois legislature has chosen not to treat service contract providers as insurers, and there is no compelling federal reason to reject Illinois's classification. Allowing service contract providers like API to be debtors in bankruptcy comports with the fundamental purpose of the Bankruptcy Code: to provide a uniform process for reorganization and liquidation.

In fact, the need for a "single rational federal system" with strictly construed exceptions is particularly clear in this case. As a result of API's nationwide business, over 325,000 consumers in 49 different states have potential claims against API. Each of those states may claim the right to exert jurisdiction over API. To put Illinois' relative stake in perspective, less than 5% of API's outstanding service contracts are held by Illinois residents. Thus, applying the

Bankruptcy Code in this case carries out Congress' intent to create a single uniform bankruptcy system that will apply to a debtor's activities in every state. The court therefore concludes that API is eligible to be a debtor under chapters 7 and 11 of the Bankruptcy Code.

### III.    State's Other Arguments for Dismissal

In addition to arguing that API is not eligible to be a debtor under the Bankruptcy Code, the State has raised four arguments in support of its motion to dismiss. First, the State asserts that API's directors lacked the corporate authority to file this case because the Order of Conservation divested API's management of that authority. Second, it argues that there are no assets in API's bankruptcy estate to be administered because API transferred all of its assets to Kayman as the assignee under the prepetition Assignment for the Benefit of Creditors. Third, it argues that API's bankruptcy estate has no assets because sovereign immunity protects the Director from any requirement to turn over to API the assets he controls under the Order of Conservation. Finally, the State contends that the automatic stay does not apply to its rehabilitation proceedings in state court so this proceeding is futile. None of these arguments has merit.

### A.    Corporate Authority to File Bankruptcy Petition

First, the State argues that API's directors did not have the power to file a bankruptcy petition because the Order of Conservation issued by the state court placed the Director in control of API's assets and business. It relies on the Order of Conservation, which gives the Director the right to "immediately take possession and control of the property, books, records, accounts,

*business and affairs*, and all other assets" of API. It asserts that this order gave the Director

complete control over API and divested officers and directors of any authority over API,

including the power to file for bankruptcy protection. The State relies on a bankruptcy court

decision addressing a director's lack of authority to file a bankruptcy petition but fails to address

controlling Seventh Circuit authority on the issue.

In <u>In re Cash Currency Exchange, Inc. v. Shine (In re Cash Currency Exchange, Inc.)</u> 762

F.2d 542 (7th Cir. 1985), the court held that a state receivership cannot preclude a debtor from

seeking bankruptcy protection. In <u>Cash Currency</u>, the Illinois Director of Financial Institutions

argued that currency exchanges that had already been placed under receivership were precluded

from filing chapter 11 petitions. The Seventh Circuit rejected that argument, stating that "the

exclusivity of an administrative receiver's title to all assets under state law is irrelevant to the

determination whether a particular entity may file for bankruptcy relief. ... [A] corporation may

not be precluded by state law from availing itself of federal bankruptcy law. ... Title 11 suspends

the operation of state insolvency laws except as to those classes of persons specifically excluded

from being debtors under the Code. <u>Id.</u> at 552 (citing <u>Int'l Shoe Co. v. Pinkus</u>, 278 U.S. 261

(1929)).

This case presents facts that are almost identical to those in <u>Cash Currency</u>, except that

the Illinois Director of Insurance is the Conservator who has also filed a complaint for

rehabilitation against a service contract provider, instead of the Illinois Director of Financial

Institutions acting as the receiver of a currency exchange. The result is the same. Neither an

Order of Conservation nor the filing of a complaint for rehabilitation under the Illinois Insurance

Code can impede API's right to file for bankruptcy protection. Otherwise, states could defeat

-30-

any entity's right to file for bankruptcy protection simply by imposing some kind of receivership under state law before the entity filed for bankruptcy. State law can suspend the operation of Title 11 only when a debtor is not eligible for relief under § 109 of the Bankruptcy Code. Corporate and Leisure Event Prods., 351 B.R. 724, 730-31 (Bankr. D. Ariz. 2006) (the only cases that have held that a state court order can enjoin a debtor's ability to file for bankruptcy "appear to arise when there is a purely intracorporate dispute or where the debtor is 'ineligible for debtor status' under the Bankruptcy Code"). The court has resolved the eligibility issue in favor of the API. Consequently, the Order of Conservation does not preclude API from filing this chapter 11 case.

The State relies on In re Gen-Air Plumbing & Remodeling, Inc., 208 B.R. 426 (Bankr. N.D. Ill. 1997) to support its argument that the appointment of a state conservator divests API's directors of the authority to file for bankruptcy protection. Gen-Air Plumbing is not relevant for two reasons. First, it involved a dispute between board members prior to the debtor's bankruptcy filing. Certain board members obtained a receivership order. Another board member, without the board approval required under the corporate charter and by-laws, filed a chapter 11 petition on Gen-Air's behalf. The court concluded that, under state corporate law, the single director lacked the authority to file the debtor's bankruptcy petition. In this case, the only alleged basis for management's lack of authority is the Order of Conservation, not any failure to comply with corporate governance law.

More importantly, to the extent the Gen-Air decision contains dicta suggesting that a state receivership might prevent a board of directors from filing a bankruptcy petition (without any

reference to <u>Cash Currency</u>), it is neither persuasive nor controlling.   The directors of API had

the authority to file its bankruptcy petition.


**B.      Assets Transferred to the API Creditors' Trust**

The State next asserts that API transferred all of its assets to the API Creditors' Trust

before it filed for bankruptcy and therefore has no assets to administer in bankruptcy.   It argues

that § 541(a)(1) of the Bankruptcy Code limits the bankruptcy estate to the "legal or equitable

interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

The State contends that, because API transferred all of its assets before it filed for bankruptcy,

there is nothing to administer in this case.

The State's argument is refuted by the text of the Bankruptcy Code.  Section § 543(b)

requires a "custodian" to turn over to the trustee all property in his possession.  11 U.S.C.

§ 543(b).  The definition of "custodian" explicitly includes "assignee under a general assignment

for the benefit of the debtor's creditors." 11 U.S.C. § 101(11)(B); <u>see also</u> <u>Cash Currency</u>, 762

F.2d at 553 ("[A] third party may have taken possession, custody or control of the debtor's assets

prior to the filing of a bankruptcy petition. If such party is a custodian within the meaning of 11

U.S.C. § 101(1), it must turn over the property of the debtor to the bankruptcy trustee.");

<u>Rosenberg v. Friedman (In re Carole's Foods, Inc.)</u>, 24 B.R. 213, 214 (1st Cir. B.A.P. 1982)

(citing legislative history evidencing Congress' intent that "property of the debtor" includes

property previously assigned for the benefit of creditors).  Consequently, assets in the possession

of the assignee must be turned over to the trustee and are part of API's bankruptcy estate.   Thus,

the transfer of API's assets to the API Creditors' Trust does not deprive API's estate of assets to administer.

### C.   The Director is Not Protected by Sovereign Immunity

The State also argues without citation that this court "is utterly without power under the United States Constitution" to require the Director to turn API's assets over to API. It argues that the State has sovereign immunity under the Eleventh Amendment to the United States Constitution from such orders and that the Director is considered the State for purposes of sovereign immunity.

The court need not decide whether the Director stands in the shoes of the State for purposes of sovereign immunity because the State has no such immunity. In Central Virginia Community College v. Katz, 546 U.S. 356, 126 S.Ct. 990, 1005 (2006), the Supreme Court held that states ceded their sovereign immunity by agreeing to the Bankruptcy Clause in Article One of the Constitution. It rejected dicta in previous opinions of the Court suggesting that sovereign immunity may apply in bankruptcy proceedings. Instead, it held that the power granted to Congress to enact bankruptcy legislation carried with it a power to subordinate state sovereignty. The states, by assenting to the Constitution, agreed "not to assert any sovereign immunity defense they might have had in proceedings brought pursuant to "laws on the subject of Bankruptcies." Central Virginia, 126 S.Ct. at 1005 (citations omitted). The Court specifically found that it was not necessary to decide whether the action to recover preferential transfers from a state at issue in the case should be characterized as an *in rem* proceeding because the power to

avoid such transfers existed at least since the 18th century and was thus part of the what the states

knew would be permitted under the bankruptcy laws to be enacted.

In this case, the obligation to obtain control of assets of the estate is a bankruptcy power

even more fundamental than the right to retrieve preferential payments. Under Central Virginia,

the states have unquestionably waived their sovereign immunity with respect to any issue relating

to turnover of property of the estate. See, e.g., In re Ravenwood Healthcare, Inc., Adv. No. 04-

1383-JS, 2006 WL 4481985, at *1 (Bankr. D. Md. Oct. 12, 2006) (bankruptcy court has

jurisdiction to compel § 542 turnover); In re Kids World of Am., Inc., 349 B.R. 152, 164 (Bankr.

W.D. Ky. 2006) (Eleventh Amendment immunity did not apply to preclude bankruptcy court's

jurisdiction over state agency in turnover action).   Sovereign immunity therefore does not bar

API from obtaining assets now under the control of the Director pursuant to the Order of

Conservation and so provides no basis for dismissing this case.


### D.     The Automatic Stay Applies

Finally, the State argues that the automatic stay in 11 U.S.C. § 362(a) does not prevent the

Director from liquidating API in state court so continuing with this bankruptcy case is futile. The

State contends that the police and regulatory power exception to the automatic stay in § 362(b)(4)

applies to the Director's actions as Conservator and his efforts to liquidate API under the Illinois

Insurance Code.  Section 362(b)(4) provides that: "The filing of a petition ... does not operate as

a stay – ... (4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the

commencement or continuation of an action or proceeding by a governmental unit ... to enforce

such governmental unit's ... police and regulatory power, including the enforcement of a

judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's ... police or regulatory power." 11 U.S.C. § 362(b)(4). The State asserts that the Director's role as Conservator "serves the State's regulatory functions" and that his effort to be appointed receiver in the state court "rehabilitation" action fall within his regulatory function under the Insurance Code. The State therefore argues that the Director is not subject to the automatic stay and can continue its liquidation proceedings against API in state court despite the filing of this bankruptcy case.

However, the State's interpretation of § 362(b)(4) goes well beyond the limits of this exception. Interpreting § 362(b)(4) to permit a state to conduct parallel liquidation proceedings would defeat the fundamental purpose of the Bankruptcy Code. "[F]ederal bankruptcy law in general, and the automatic stay in particular, exist in part to centralize the process of distributing the debtor's estate among its creditors." In re Emerald Casino, Inc., No. 03 A 01929, 2003 WL 23147946, at *9 (N.D. Ill. Dec. 24, 2003), aff'd sub nom., Village of Rosemont v. Jaffee, 482 F.3d 926 (7th Cir. 2007). "The purpose of the automatic stay is to preserve what remains of the debtor's insolvent estate and to provide a systematic equitable liquidation procedure for all creditors." In re Holtkamp, 669 F.2d 505, 508 (7th Cir. 1982). Nothing in § 362(d)(4) evidences a Congressional intent to permit a parallel state court liquidation to proceed under the guise of a state's regulatory power.

The term "regulatory power: is not defined in the Bankruptcy Code. However, "the statute's legislative history states that § 362(b)(4) includes a governmental unit's suits against a debtor 'to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws.'" In re Phillips, No. 06-3061, 2007 WL 1264027, at

-35-

*5 (Bankr. N.D.Ind. March 27, 2007) (citing H.R.Rep. No. 595, 95th Cong., 1 st Sess. 343 (1977); In re Herrera, 194 B.R. 178, 184-85 (Bankr.N.D.Ill.1996).

The Seventh Circuit addressed this issue in Cash Currency, 762 F.2d at 554-55. The court held that an action filed by the Illinois Director of Financial Institutions under the liquidation provisions of the Illinois Community Currency Exchange Act did not fall under the regulatory power exception to the automatic stay in § 362(b)(4). Id. at 555. The court stated that the § 362(b)(4) exception applies "to the enforcement of state laws affecting health, welfare, morals and safety, but not to regulatory laws that directly conflict with the control of the res or property by the bankruptcy court." Id. (citation omitted). The court held that the State's liquidation proceeding did not fall within the ambit of §364(b)(4) for two reasons: (1) because the liquidation proceedings under the Community Currency Exchange Act served only to protect the rights of creditors, not to enforce laws affecting health, welfare, morals, and safety, and (2) because the liquidation procedures "directly conflict with the control of the property by the bankruptcy court," Id.

The State argues that the 1998 amendments to § 362(b)(4) had the effect of overruling Cash Currency. Before 1998, the exception in § 362(b)(4) applied only to actions stayed in § 362(a)(1) - "the commencement or continuation ... of a judicial, administrative, or other action or proceeding against the debtor...." 11 U.S.C. § 362(a)(1). In 1998, § 362(d)(4) was amended to apply to proceedings stayed in § 362(a)(3) - "to obtain possession of property of the estate ... or to exercise control over property of the estate." 11 U.S.C. 362(a)(3). See In re Emerald Casino, 2003 WL 23147946, at *9. This amendment expanded the exception to allow states to pursue regulatory actions even if they conflict with the bankruptcy court's control of property of

-36-

the estate. The State argues that this amendment effectively overruled <u>Cash Currency</u> and that it may pursue its liquidation of API as part of its regulatory power.

The State's argument fails because the 1998 amendments to § 362(b)(4) only partially overruled <u>Cash Currency</u>. While state authorities are no longer prevented from taking regulatory action against property of the estate, the amendments did not affect the court's conclusion that liquidation proceedings designed to protect the rights of creditors are not regulatory actions that fall within this exception. As noted in <u>Emerald Casino</u>, "the court [in <u>Cash Currency</u>] found that the State's interest was to protect the rights of other creditors, an interest that is not regulatory within the meaning of § 362(b)(4). ... Therefore, the State could not take control of the property when it did not have a valid regulatory interest." <u>Emerald Casino</u>, 2003 WL 23147946, at *7.

The State in <u>Emerald Casino</u> was clearly pursuing a regulatory action. It sought to revoke the debtor's gaming license based upon the debtor's prior misconduct. <u>Emerald Casino</u>, 2003 WL 23147946, at *8. The State was concerned about the debtor's possible commission of fraud and its connection to organized crime. <u>Id.</u> at *2. Revocation of the debtor's gaming license was necessary to prevent further fraud, protect consumers and ensure the safety of casino patrons. <u>Id.</u>

By contrast, in this case, the State is not enforcing any laws intended to protect the health, welfare or safety of the public. API had ceased conducting business in February 2007, before it filed for bankruptcy. The State filed its rehabilitation proceeding to control the liquidation of API's assets, not to enforce any particular violation of the Act. As in <u>Cash Currency</u>, the State's actions here are solely for the benefit of API's creditors. Because the State is not acting in its regulatory capacity, the regulatory and police power exception to the automatic stay in

§ 362(b)(4) does not apply. Therefore, the regulatory power exception to the automatic stay does

not provide a basis for dismissing this case.

### Conclusion

For all of the foregoing reasons, the State's motion to dismiss this case is denied.

Dated:  June 12, 2007

ENTERED:

_____
CAROL A. DOYLE
United States Bankruptcy Judge